J-S78016-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| B.N.S., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| M.O.W., | |
| Appellant | No. 1444 MDA 2014 |

Appeal from the Order entered July 31, 2014,
in the Court of Common Pleas of Dauphin County,
Civil Division, at No(s): 2012 CV 03020 CU

BEFORE:  GANTMAN, P.J., JENKINS, and MUSMANNO, JJ.

MEMORANDUM BY JENKINS, J.:                    **FILED APRIL 28, 2015**

M.O.W. ("Father") appeals, *pro se*, from the order dated July 30, 2014, and entered on July 31, 2014, in the Dauphin County Court of Common Pleas, Civil Division, denying Father's request for visitation with his minor child, L.N.S. ("Child"), born in February of 2005.[1]  We affirm.

The relevant facts and procedural history of this case are as follows. B.N.S. ("Mother") and Father are the biological parents of Child, who was born in February of 2005.  Mother and Father were never married.  Six weeks after Child's birth, in March 2005, Father was arrested and charged with, *inter alia*, simple assault for his involvement in an altercation with Mother. N.T., 7/21/14, pp. 8-11.  Father was convicted of the simple assault and related crimes and served seven months in prison before being released

---

[1] The trial court's order also amended its previous custody order of June 12, 2012 to permit Father telephone conversations with Child once every two weeks for the duration of five to ten minutes.

on parole in September 2005, at which time Child was approximately eight months old. *Id.*

In February 2006, Father was arrested and charged with robbery, person not to possess a firearm, aggravated assault, and other related charges. N.T., 7/21/14, pp. 4-6. Subsequently, Father pled guilty to and was convicted of the charges. *Id.* Father was sentenced to a term of incarceration of eight to twenty-two years, which he began serving on February 3, 2006. *Id.* He is currently incarcerated at the State Correctional Institution at Mahanoy ("SCI Mahanoy"), located in Frackville, Pennsylvania.

Since birth, Child has resided with Mother, who has served as Child's primary caretaker. Mother's Custody Complaint, 4/13/12, at 5-8. From September 1, 2010 to the present, Child has resided with Mother, Mother's grandmother ("Maternal Great-Grandmother"), and Mother's fiancé at a residence in Harrisburg, Pennsylvania. *Id.* at 5-6.

The instant custody matter began on April 13, 2012 when Mother filed, *pro se*, a complaint for custody, seeking sole legal and primary physical custody of Child. On April 20, 2012, the trial court issued an order directing Mother and Father to participate in a custody conference before a custody conference officer, in an effort to resolve the issues in dispute. On June 8, 2012, Mother and Father, both without counsel, participated in the custody conference and reached a custody agreement. On June 11, 2012, the trial court issued a custody order ratifying the terms of the agreement as follows:

1. Sole legal and primary physical custody of [Child] shall be with [] Mother.
2. No party shall relocate [Child] if such relocation will significantly impair the ability of a non-relocating party to exercise his or her custodial rights unless (a) every person

who has custodial rights to [Child] consents to the proposed relocation or (b) the [trial court] approves the proposed relocation. . . .

3. Should there be a **substantial change in circumstances**, either party may request an increase/decrease or change in the current custodial status by filing a **Petition for Modification** with the Dauphin County Prothonotary's Office.

Custody Order, 6/12/12 (emphasis in original).

On March 28, 2014, Father filed, *pro se*, a petition for modification of the custody order. According to Father's petition, since his incarceration he had maintained contact with Child via correspondence, telephone conversations, and the occasional visit, all of which Mother terminated upon receiving sole legal and primary physical custody of Child. Father's Petition for Modification, 3/28/14, at 6. In filing the petition, Father sought to have the trial court grant him telephone communication and visitation with Child. On July 21, 2014, the trial court conducted a custody hearing to address Father's petition.

At the hearing, the trial court heard testimony from Mother and Father, who appeared via video conference. In his testimony, Father detailed his extensive criminal history and acknowledged how his repeated and lengthy periods of incarceration had precluded him from fulfilling his role as Child's parent. N.T., 7/21/14, at 8-9, 36. However, Father also testified to his efforts aimed at maintaining a relationship with Child in spite of his incarcerations through correspondence and telephone conversations. *Id.* at 15-17. Father stated that, from 2007 to 2012, "I talked to [Child] at least one time a week, sometimes two." *Id.* at 17. Father also claimed that Mother brought Child to visit him in prison "numerous times" throughout 2006, once in July 2007, and once more in 2010. *Id.* at 13-15. However,

Father also testified that he had not spoken to Child since May 2012 on account of Mother's request by fax, dated June 20, 2012, that he not call or write to Child anymore. *Id.* at 16-17, 45. Further, Father noted that he was eligible for parole and was awaiting his next parole hearing scheduled to occur "in 60 days or more." *Id.* at 4-5.

Mother also testified at the hearing. Mother explained that any correspondence or telephone communication between Father and Child was orchestrated by Maternal Great-Grandmother without Mother's knowledge:

> And so [Father's] in jail. There's no contact with me. Now [Maternal Great-Grandmother], she feels that because he is the father, he will always love [Child] and he's still [Child's] father no matter what. So she was the one that would be sending him pictures. And they would send letters back and forth with each other. I was not included in those letters.
>
> She would take those letters from him and send them to [Child] and send him cards and have [Child], like, draw on paper to send to him. I didn't send him anything.
>
> So the contact or the phone calls was not through me. It was through [Maternal Great-Grandmother] with me not even knowing. . . .

N.T., 7/21/14, pp. 28-29. Mother also disputed Father's testimony concerning the frequency of and circumstances surrounding Child's visits with Father in prison, indicating that she took Child to see Father only once and that Maternal Great-Grandmother coordinated another visit in 2008 without Mother's knowledge. *Id.* at 31. Further, Mother testified to her emphatic opposition to the prospect of visitation with Father during the remainder of his incarceration and stated that she did not want him to call or write to Child anymore. *Id.* at 35-43. Finally, Mother noted that she was

open to the possibility of supervised visitation in the future in the event of Father's release on parole. *Id.* at 43.

On July 30, 2014, the trial court issued the underlying order, amending its previous custody order of June 11, 2012 to permit Father telephone conversations with Child once every two weeks for a duration of five to ten minutes. The trial court denied Father's request for visitation with Child. On August 27, 2014, Father filed a timely notice of appeal but failed to simultaneously file a concise statement of errors complained of on appeal, in contravention of Pa.R.A.P. 1925(a)(2)(i) and (b). On September 4, 2014, the trial court issued an order directing Father to file a concise statement of errors complained of on appeal within twenty-one days of the order. Thereafter, on September 10, 2014, Father filed a concise statement of errors complained of on appeal.[2]

On appeal, Father raises a single question for our review:

> Did the trial court abuse [its] discretion. . . by denying [Father's] request for visitation with [Child] [due] to [Father's] current incarceration[?]

Father's Brief at 4.

In custody cases, our scope and standard of review is as follows:

---

[2] Although Father failed to comply with Pa.R.A.P. 1925(a)(2)(i) and (b), relating to children's fast track appeals, we decline to dismiss or quash his appeal. *See In re K.T.E.L*, 983 A.2d 745, 747 (Pa.Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal **with** the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis). Here, Father filed the Rule 1925(b) statement fourteen days after filing the notice of appeal. However, since the misstep was not prejudicial to any of the parties and did not impede the trial court's ability to issue a thorough opinion, the procedural error was harmless. *Cf. J.P. v. S.P.*, 991 A.2d 904 (Pa.Super. 2010) (appellant waived all issues by failing to timely comply with the trial court's direct order to file a concise statement).

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

**C.R.F. v. S.E.F.**, 45 A.3d 441, 443 (Pa. Super. 2012) (citation omitted).

Additionally, this Court has stated:

[t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

**Ketterer v. Seifert**, 902 A.2d 533, 540 (Pa. Super. 2006) (citation omitted).

"With any child custody case, the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all the factors that may legitimately affect the physical, intellectual, moral and spiritual well-being of the child." **M.J.M. v. M.L.G.**, 63 A.3d 331, 334 (Pa. Super. 2013) (citation omitted). Further, the party seeking modification of custody arrangements has the burden of showing that modification is in the child's best interest. **Ketterer**, 902 A.2d at 539 (citation omitted). Consistent with the prevailing goal of custody proceedings, the trial court was obligated to consider all factors relevant to the child's well-being in

evaluating Father's contentions.  *J.M.R. v. J.M.*, 1 A.3d 902, 911 (Pa. Super. 2010).

The right to visitation, although constrained by a natural parent's incarceration, is not extinguished by the sole fact of incarceration.  *Etter v. Rose*, 684 A.2d 1092, 1093 (Pa. Super. 1996).  Rather, where one parent is incarcerated the presumption is that visitation at the prison is not in the child's best interest.  *Id.*  The incarcerated parent, however, has the right to have a hearing, at which time he is given the opportunity to present evidence to rebut that presumption and show that the visitation would be beneficial and in the child's best interest.  *Id.*

Further, we have delineated the factors to be considered by the trial court in evaluating the best interests of a child when deciding an incarcerated parent's request for visitation: (1) age of the child; (2) distance and hardship to the child in traveling to the visitation site; (3) the type of supervision at the visit; (4) identification of the person(s) transporting the child and by what means; (5) the effect on the child both physically and emotionally; (6) whether the parent has and does exhibit a genuine interest in the child; and (7) whether reasonable contacts were maintained in the past.  *Etter*, 684 A.2d at 1093.  Additionally, we regard the nature of the criminal conduct that culminated in the parent's incarceration as another relevant consideration.  *D.R.C. v. J.A.Z.*, 612 Pa. 519, 536, 31 A.3d 677, 687 (2011).

On appeal, Father contends that the trial court erred in its application of the *Etter* factors to the facts of this case, and, thereby, committed an abuse of discretion in denying his request for visitation with Child.

Specifically, Father argues that the trial court, in making its findings, accorded improper weight and credibility to Mother's testimony vis-à-vis his own testimony and, as a result, came to a decision not conducive to the best interest of Child. We disagree.

In its Rule 1925(a) opinion, the trial court explained the reasoning underlying its decision as follows:

> The [trial court] does not believe it is in the best interest of [Child] to have physical visits at a state correctional institution considering the lack of contact [] Father has had with [Child] since [Child's birth], and the potentially traumatizing nature of visiting a state correctional institut[ion]. The [trial court] is also mindful that Father has an extensive and violent criminal history including domestic violence against Mother and indecent assault against Mother's younger sister. The distance to SCI Mahanoy in Frackville, Pennsylvania is significant and may be traumatizing to a child of this age[3]. Mother is not at all convinced that Father has a genuine interest in [Child], and [the trial court] is not fully convinced either. The [trial court] does believe that at some point there may be some type of reunification, and believes that regular telephone calls are an appropriate and an initial step toward that reunification.

Trial Ct. Op., 9/18/14, at 3-4.

After a careful review of the record, we conclude that the trial court's findings are supported by competent evidence, and that it reasonably concluded that regular telephone communication between Father and Child, not visits to the prison, will best serve Child's needs and welfare at this stage in Child's life. In applying the **Etter** factors, the trial court reasonably concluded that Father failed to provide sufficient evidence to warrant visitation at the prison. Indeed, Father presented no evidence to rebut the presumption that visitation at the prison would not be in Child's best

---

[3] Child is 10 years old.

interest. Although Father testified to his love and affection for Child and has expressed a willingness to fulfill his parental responsibilities, his failure to put himself in a position to develop a parental relationship with Child as well as his complete absence throughout the majority of Child's life due to his repeated incarceration belie such sentiments. Moreover, to the extent that Father asks this Court to revisit the trial court's determinations regarding both his and Mother's credibility as testifying witnesses, we must defer to the trial court "who viewed and assessed the witnesses first hand." *J.M.R. v. J.M.*, 1 A.3d at 911; *see also In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006) (stating that "[t]he trial court, not the appellate court, is charged with the responsibilities of evaluating credibility of the witnesses and resolving any conflicts in the testimony. In carrying out these responsibilities, the trial court is free to believe all, part, or none of the evidence."). After careful consideration, we decline to disturb the trial court's credibility determinations.

In consideration of these circumstances and our careful review of the record, we conclude that the trial court did not abuse its discretion or commit an error of law in denying Father's request for visitation with Child.

Accordingly, for the reasons stated above, we affirm the trial court's order denying Father's request for visitation with Child.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/28/2015